

FILED
COMMON PLEAS COURT

2017 MAR 23 A 10: 54

JOHN A. COTRELL
CLERK OF COURTS
JEFFERSON COUNTY OH

## IN THE COURT OF COMMON PLEAS
## JEFFERSON COUNTY, OHIO

| | |
|---|---|
| **MATTHEW M. MAURER**<br>1987 Township Road 220<br>Bloomingdale, Ohio 43910<br><br>And<br><br>**RITA MAURER**<br>1987 Township Road 220<br>Bloomingdale, Ohio 43910<br><br>       Plaintiffs,<br>  vs.<br><br>**CHESAPEAKE EXPLORATION, LLC**<br>c/o CT Corporation System, Statutory Agent<br>1300 East Ninth Street<br>Cleveland, Ohio 44114<br><br>And<br><br>**DAWSON GEOPHYSICAL COMPANY**<br>c/o CT Corporation System, Statutory Agent<br>1300 East Ninth Street<br>Cleveland, Ohio 44114<br><br>       Defendants, | CASE NO. 17CV113<br><br>JUDGE *Joseph J Bruzzese Jr.*<br><br>TYPE: OTHER CIVIL<br><br>***(JURY DEMAND ENDORSED HEREIN)*** |

## C O M P L A I N T

For their Complaint against the above-captioned Defendants ("Defendants"), Matthew M.

and Rita Maurer ("Plaintiffs"), state the following:

01631727-1 / 27593.00-0001

## PARTIES

1.      Plaintiffs, who are husband and wife, are Ohio residents.

2.      The Plaintiffs own the real property at issue in this lawsuit, which consists of approximately 1.7180 acres in Salem Township, Jefferson County, assigned Jefferson County permanent parcel number 24-02501-000 ("Real Estate"). There is a residential structure located on the Real Estate ("Residence"). Plaintiffs reside at the Residence.

3.      Defendant, Chesapeake Exploration, LLC ("Chesapeake"), is a foreign limited liability company that is registered to do business in the State of Ohio. As will be discussed below, Chesapeake has sufficient minimum contacts within the State of Ohio and this Court therefore has personal jurisdiction over Chesapeake.

4.      Defendant, Dawson Geophysical Company ("Dawson"), is a foreign company that is registered to do business in the State of Ohio. As will be discussed below, Dawson has sufficient minimum contacts within the State of Ohio and this Court therefore has personal jurisdiction over Dawson.

## VENUE

5.      Venue is proper in this Court based upon Civ.R. 3(B)(3), (5), and (6).

## FACTS

6.      On or about June 29, 2011, Chesapeake entered into an oil and gas lease for the Real Estate ("Lease"). A true and accurate copy of the Lease is attached hereto as Exhibit 1 and made a part of this Complaint.

7.      Paragraph one of the Lease's Addendum bars Chesapeake or any of Chesapeake's agents from conducting any surface activity relating to oil and gas exploration

01631727-1 / 27593.00-0001                                                                    2

operations within 500 feet of any residential structure located on the Real Estate, which would include the Residence.

8.  Upon information and belief, Chesapeake subcontracted with Dawson for purposes of conducting seismic, geophysical testing of the Real Estate and the Real Estate's mineral estate.

9.  On or about December 11, 2015, Dawson, while acting on behalf of Chesapeake, conducted seismic, geophysical testing of the Real Estate and the Real Estate's mineral estate.

10.  That testing involved the use of heavy-duty trucks commonly known as or referred to as "vibroseis trucks" or "seismic vibrators."

11.  Such testing involves the infliction of shock waves through the real property. Those shock waves have to be created with enough force to have them travel deep within the Earth so that the operator is able to image the mineral deposits located within the Earth, including to depths which in some cases exceed 10,000 feet. The process involves repeated pounding on the surface thereby generating shock waves.

12.  In this case, Defendants' testing utilized the surface of the Earth, including, upon information and belief, a portion of the Real Estate's surface.

13.  That testing took place within 500 feet from the Residence, in direct violation of the Lease's terms.

14.  Rita Maurer was present within the Residence at the time of the seismic testing. The seismic testing shook both the Residence and Rita Maurer.

15.     The seismic testing caused the Residence to suffer several physical defects and/or injuries, including cracks within its foundation and damage to the Residence's fireplace and chimney.

16.     The seismic testing also caused the Plaintiffs' water well, which is located on the Real Estate, to become damaged, including, but not limited to, by substantially increasing the amount of iron within the Plaintiffs' water supply.

17.     On or about August 16, 2016, Plaintiffs' counsel sent a notice and demand to Chesapeake detailing Chesapeake's breaches and requesting relief. To date, Chesapeake has not responded to that notice and has refused to remedy the damage to the Residence and the Plaintiffs' water well.

## COUNT ONE
### *(Breach of Contract)*

18.     Plaintiffs incorporate and reallege all paragraphs of this Complaint as if fully rewritten herein.

19.     The Lease and all addendums thereto constitute a valid, binding contract between Plaintiffs and Defendants.

20.     Plaintiffs have fully performed under the Lease.

21.     Defendants have breached the Lease by including, but not limited to, conducting surface activities under the Lease within 500 feet from the Residence.

22.     Defendants' breaches of the Lease directly and proximately caused damage to the Residence and the water well located on the Real Estate.

23.     As a direct and proximate result of Defendants' breaches, Plaintiffs have suffered damages in excess of $25,000, to be determined at trial.

## COUNT TWO
### *(Negligence)*

24.     Plaintiffs incorporate and reallege all paragraphs of this Complaint as if fully rewritten herein.

25.     Defendants owed Plaintiffs a duty of reasonable care while operating on or near the Real Estate. Defendants intentionally and consciously ignored their duty of reasonable care.

26.     As detailed above, Defendants breached their duty of reasonable care in numerous ways.

27.     Defendants committed negligence in the performance of their activities.

28.     Defendants also committed gross negligence by consciously and intentionally ignoring their legal obligations to refrain from conducting dangerous activities within close proximity of Plaintiffs and the Residence and on the Real Estate under circumstances which Defendants knew or should have known there was a great probability of harm to Plaintiffs.

29.     As a direct and proximate result of Defendants' negligence and/or gross negligence, Plaintiffs have suffered damages in an amount in excess of $25,000, to be determined at trial.

30.     Further, Plaintiffs believe that, based upon the circumstances, Plaintiffs should be awarded punitive damages in an amount in excess of $25,000, to be determined at trial, and attorney's fees for Defendants' actions, as they acted with actual malice and/or with a reckless disregard of Plaintiffs' rights.

## COUNT THREE
### *(Trespass)*

31.     Plaintiffs incorporate and reallege all paragraphs of this Complaint as if fully rewritten herein.

32.     The Lease permitted Defendants to access and/or use only certain portions of the Real Estate and/or restricted Defendants' ability to conduct surface activities under the Lease within a buffer zone around the Residence.

33.     Defendants were not entitled to access any portion of the Real Estate not specifically delineated within the Lease, which included any surface activities within 500 feet from the Residence.

34.     Defendants accessed and/or utilized portions of the Real Estate to which Defendants had no right to access or use, including by conducting seismic activities within 500 feet of the Residence and also creating physical invasions through shock waves that were created by actions occurring within 500 feet from the Residence.

35.     Defendants' actions outside of the permitted portions of the Real Estate and/or within the buffer zone created by the Lease constitute a trespass.

36.     Defendants' intentional actions outside of the permitted portions of the Real Estate and/or within the buffer zone created by the Lease resulted in unreasonable and/or excessive use of the Real Estate exceeding the scope of the Lease.

37.     As a direct and proximate result of Defendants' trespass, Plaintiffs have suffered actual compensatory damages in excess of $25,000, to be determined at trial.

38.     In addition to compensation for actual damages, Plaintiffs are entitled to punitive damages in an amount in excess of $25,000 to be determined at trial, and attorney's fees.

01631727-1 / 27593.00-0001

6

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief on all or some of their claims against Defendants:

a. As to Count One: an award of damages in an amount in excess of $25,000;

b. As to Count Two: an award of damages in an amount in excess of $25,000 and an award of punitive damages and attorney's fees;

c. As to Count Three: an award of actual compensatory damages in an amount in excess of $25,000 and an award of punitive damages and attorney's fees; and

d. Costs, attorney's fees, and any other legal and equitable relief to which Plaintiffs may be entitled.

Matthew W. Onest (0087907), and
John A. Burnworth (0077151), of
KRUGLIAK, WILKINS, GRIFFITHS
& DOUGHERTY CO., L.P.A.
4775 Munson Street, N.W. / P.O. Box 36963
Canton, Ohio 44735-6963
Phone: (330) 497-0700 / Fax: (330) 497-4020
monest@kwgd.com; jburnworth@kwgd.com
ATTORNEYS FOR PLAINTIFFS

## JURY DEMAND

Plaintiffs hereby demand, pursuant to Rule 38 of the Ohio Rules of Civil Procedure, that a jury be impaneled to try all issues contained herein.

Matthew W. Onest (0087907), and
John A. Burnworth (0077151), of
KRUGLIAK, WILKINS, GRIFFITHS
& DOUGHERTY CO., L.P.A.
ATTORNEYS FOR PLAINTIFFS

## INSTRUCTIONS FOR SERVICE

TO THE CLERK OF COURTS:

Please issue Summons together with a copy of the foregoing Complaint to be served upon the Defendants at the addresses as set forth in the above caption by certified mail, return receipt requested, and make the same returnable according to law.

Matthew W. Onest (0087907), and
John A. Burnworth (0077151), of
KRUGLIAK, WILKINS, GRIFFITHS
& DOUGHERTY CO., L.P.A.
ATTORNEYS FOR PLAINTIFFS

**PAID-UP**

04/10 - OH                       **OIL AND GAS LEASE**    Lease No. _____

    This Lease made this 29th day of June, 2011, by and between <u>Matthew M. Maurer and Nancy L. Maurer,</u> <u>Husband and Wife,</u> of <u>1987 Township Highway 220, Bloomingdale, OH 43910,</u> hereinafter collectively called "Lessor," and **CHESAPEAKE EXPLORATION, L.L.C.**, an Oklahoma limited liability company, 6100 N. Western Avenue, Oklahoma City, Oklahoma 73118, hereinafter called "Lessee."

    WITNESSETH, that for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

    LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment; to use and occupy the subsurface for a wellbore or wellbores to drill across, through and under the Leasehold.

    DESCRIPTION. See **Exhibit "B"** for lands described in **SALEM** Township, **JEFFERSON** County, **Ohio**

SALEM 010N-003W S:22; #24-02501-000

**See Exhibit "A" and Exhibit "B" attached hereto and made a part hereof.**

and described for the purposes of this agreement as containing a total of <u>1.7180</u> Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

    LEASE TERM. This Lease shall remain in force for a primary term of **five (5)** years from 12:00 A.M. June 29, 2011 (effective date) to 11:59 P.M. June 28, 2016 (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or

- 1 -

*EXHIBIT 1*

lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of three (3) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE.

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. **The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.**

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor a Royalty equal to one-eighth (1/8) of the net revenue realized by Lessee for all oil and any constituents thereof produced and marketed from the Leasehold, less the cost to transport, handle, separate, meter, treat, process and market the oil.

2. GAS: To pay Lessor an amount equal to one-eighth (1/8) of the net revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, gather, dehydrate, compress, market, meter, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that is awaiting completion (such as hydraulic fracture stimulation), or that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework,

- 2 -

stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means. In the event the leased lands are encumbered by a prior mortgage, then, notwithstanding anything contained herein to the contrary, Lessee shall have the right to suspend the payment of any royalties due hereunder, without liability for interest, until such time as Lessor obtains at its own expense a subordination of the mortgage in a form acceptable to Lessee.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease, and the local property tax assessment calculation of the lands covered by the Lease, or the deeded acreage amount, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well on the Leasehold within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

- 3 -

DISPOSAL AND INJECTION WELLS. Lessor hereby grants to Lessee the right to drill wells and/or re-enter existing wells, including necessary location, roadway and pipeline easements and rights of way, on any part of the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, other than a potable water strata, of air, gas, brine, completion and production fluids, waste water and any hydrocarbon related substances from any source, including, but not limited to wells on the Leasehold or lands pooled or unitized therewith or from properties and lands outside the Leasehold or lands pooled or unitized therewith, and to conduct all operations as may be required, for so long as necessary and required by Lessee for purposes as herein provided. If, at the expiration of the primary term, Lessee is disposing and/or injecting into any subsurface strata underlying the Leasehold or lands pooled or unitized therewith or conducting operations for such disposal and/or injection and this lease is not being maintained by any other provision contained herein and no other payments are being made to Lessor as prescribed hereunder, Lessee shall pay to Lessor the sum of one thousand dollars ($1,000.00) per year, proportionately reduced to Lessor's ownership in the Leasehold and surface as it bears to the full and undivided estate, beginning on the next anniversary date of this Lease and said payment and term of this Lease, insofar as to terms and provisions contained herein applicable to disposal and injection wells, shall continue annually thereafter for so long as necessary and required by Lessee for purposes as herein provided and until all disposal and/or injection wells located on the Leasehold or on lands pooled or unitized therewith are plugged and abandoned. Lessor agrees that if required by Lessee, regulatory agency or governmental authority having jurisdiction, Lessor shall enter a separate Disposal and Injection Agreement with Lessee for the purposes as herein provided.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein and in the associated Order of Payment (if any). No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

TITLE CURATIVE. Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be

- 4 -

added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

    SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

    COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.


    IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.


_____
Matthew M. Maurer


_____
Nancy L. Maurer

ACKNOWLEDGEMENT

STATE OF _____ )
                           ) §
COUNTY OF _____ )

    On this _____ day of _____, 2011, before me a notary public, the undersigned officer, personally appeared **Matthew M. Maurer and Nancy L. Maurer, Husband and Wife**, known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.

        My Commission Expires:_____

        Signature/Notary Public:_____

        Name/Notary Public (print):_____

Lease Record: 24123  0JEF

## EXHIBIT "A"

This Exhibit "A" is attached to and made a part of that Certain Oil and Gas Lease dated June 29th, 2011, by and between <u>Matthew M. Maurer and Nancy L. Maurer, Husband and Wife</u>, as Lessor, and Chesapeake Exploration, L.L.C., as Lessee. If any of the following provisions conflict with or are inconsistent with the printed provisions or terms of this Lease, the following provisions shall control.

### USE OF PROPERTY

#### Restriction of Surface Activity

Lessee shall not have the right to place any well pad within Five Hundred (500) Feet nor conduct any surface activity within Five Hundred (500) Feet of any residential structure nor within Three Hundred (300) Feet of any permanent structure existing at the time of Lessee's operations and being utilized by Lessor on the leased premises without the express written consent of the Lessor. Examples of existing permanent structures being utilized are barns, pole buildings and garages. Existing permanent structures are not intended to include any dilapidated structures not fit for common use.

#### Location Approval

Location of any well, access roads, pipelines routes, tank batteries, compressor, or other facilities shall be approved by Lessor or one of their representatives in writing prior to location thereof. Such approval shall not be unreasonably withheld, conditioned, or delayed. Upon receipt of Lessee's written site-location approval request, Lessor shall have fourteen (14) days from the date of said correspondence to approve in writing or to advise Lessee in writing of Lessor's disapproval of a specific location(s) associated with Lessee's site plan and to provide Lessee with an alternate location(s) that is deemed to be reasonable, economically feasible and at a legal location pursuant to all applicable rules and regulations. Lessor's failure to notify Lessee of written approval of said site plan or to provide Lessee with written objection and an alternate location(s) within fourteen (14) days shall constitute Lessor's approval of the proposed site location.

#### Surface Damage Clause

Provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations, Lessee agrees to pay Twenty-Five Thousand Dollars and 00/100 ($25,000.00) as a supplemental surface damage payment for each pad site built on the herein described leased premises. Multiple wells may be drilled from a single drill site pad located on the surface of the leased premises. In the event Lessee physically and materially disturbs more than twenty (20) acre s for any drill site pad, Lessor shall be compensated at the rate of Three Thousand Dollars and 00/100 ($3,000.00) for each net acre so disturbed in excess of twenty (20) acres.

#### Surface Restoration Clause

It is agreed and understood that the Lessee shall repair any material damage resulting from Lessee's operations to the surface of said premises and restore the surface as nearly as practicable to the condition in which said land existed at the time of the commencement of drilling operations upon above described land. This work shall be completed within a reasonable amount of time after all cessation of the drilling operations upon the said lands. This work shall be done at the sole expense of the Lessee.

#### Pipeline – No Foreign Gas

Any pipelines constructed pursuant to the terms of this lease shall be for transporting oil and/or gas from a well(s) drilled on the leased premises or lands pooled therewith unless the prior written consent of Lessor is obtained.

#### Pipeline – Plow Depth

When requested in writing by Lessor prior to the laying of pipeline, Lessee shall bury the pipeline a minimum depth of 36 inches below ground level, measured from the top of the pipe, where possible.

#### No Compression on Leased Premises

Other than those necessary for the production and transportation of products produced from the Leased Premises or lands pooled or unitized therewith, it is agreed and understood that compression facilities will not be placed on the leased premises, unless written consent is provided by the Lessor, which consent shall not be unreasonably withheld, delayed or conditioned. Lessee agrees that the leased premises described herein will not be used as a central processing facility. Where compression facilities, temporary or permanent, are used upon the premises, Lessee shall take all reasonable efforts to minimize the noise associated with the same.

- 6 -

### Fence Clause
Upon Lessor's written request, Lessee shall at its sole cost, expense, and design install fencing for the protection of livestock around any well site(s), tank battery (ies) water impound (s), surface installation (s), or facility (ies) installed on the leased premises by Lessee provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations. Lessee also agrees to keep fences and gates constructed or used by Lessee in good repair, closed and locked at all times, unless in use by authorized personnel.

### Gate Clause
Upon the written request of Lessor, Lessee shall install at its sole cost and expense a gate with a double locking system at the entrance of any road constructed by Lessee on the leased premises provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations. Lessee shall provide keys to such gate locks to Lessor.

### Timber Clause
Lessee and Lessor agree that prior to the removal of any marketable timber resulting from Lessee's operations under the terms of this lease, Lessee shall provide thirty (30) days written notice to Lessor providing Lessor an opportunity to arrange for the harvesting of said timber within thirty (30) days of receipt of said notice. If Lessor does not exercise such right to harvest, an appraisal shall be constructed by a qualified third party forester and Lessee shall pay Lessor the said appraisal value prior to harvesting. In the event agreement is not reached as to value each party shall select an appraiser and the two appraisers shall select a third- party neutral appraiser who shall determine the value of the timber which will be paid by Lessee to prior to harvesting.

## WATER

### Water Quality
Lessee shall have Lessor's current water supply sampled and tested prior to spudding of any well drilled on the leased premises, or drilled on acreage unitized with the leasehold. Should Lessor experience a material adverse change in the quality or quantity of Lessor's water supply, during or immediately after the completion of Lessee's drilling operations, Lessee shall, within 48 hours of Lessor's written request, cause Lessor's water supply to be sampled and tested by a qualified and independent third party at Lessee's expense. Should such a test reflect a material adverse change as the result of Lessee's drilling operations (If such test reflects a material adverse change in the Lessor's water quality or quantity, then it shall be presumed that the same was caused by the Lessee's operations and, in that instance), Lessee agrees to provide Lessor with potable water within 48 hours and until such a time as Lessor's water source quality and quantity has been repaired or replaced with a source of substantially similar quality (to as close to pre-drilling status quo as reasonably possible, with all reasonably related costs of repair and maintenance to be paid by Lessee).

### No Water Usage
Lessee is not granted any right whatsoever to use any water, surface or subsurface, within the leasehold for its operations, including, but not limited to wells, ponds, streams, and creeks, unless Lessor should give written consent to do so.

### Fresh Water Damage Protection
In the event any activity carried on by the Lessee pursuant to the terms of this lease adversely and permanently damages, disturbs, or injures the quality or quantity of Lessor's fresh water well or source located on these leased premises, Lessee shall at its sole cost and expense take all reasonable and customary steps to correct any such damage, disturbance or injury and to remediate the same to as close to pre-damage status quo as reasonably possible, with all reasonably related costs of repair and maintenance to be paid by Lessee.

## PRODUCTION

### Commencement of Operations
Commencement of operations shall be defined as entering upon the herein described premises with equipment necessary to build any access road(s) for drilling of a well in compliance with applicable federal, state, and local law, subsequently followed by a drilling rig for the spudding of the well to be drilled.

Commencement of operations shall be defined as Lessee having secured a drilling permit from the State and further entering upon the herein described premises with equipment necessary for the preparing of a well pad or commencing other activities necessary for the spudding of a well to be drilled. Once commenced, and upon expiration of the primary term of this lease or any extension thereof, said operations shall not lapse for a period of greater than ninety (90) consecutive days prior to the completion of the well.

## Shut-In

It is understood and agreed that this lease may not be maintained in force for a continuous period of time longer than thirty-six (36) consecutive months, or sixty (60) cumulative months after the expirations of the primary term or any extension hereof solely by the provision of the shut-in royalty clause. The shut-in status of any well shall persist only so long as it is necessary to correct, through the exercise of good faith and due diligence, the condition giving the rise to the shut-in of the well.

## Shut-In Royalty

If a well capable of producing oil or gas within a drilling unit containing any portion of the Leasehold premises is shut-in for a period greater than one-hundred and twenty (120) days in any calendar year, then Lessee shall pay to Lessor a shut-in royalty equal to Twenty Five ($25) Dollars for each net acre of this Lease contained within said drilling unit. Said Shut-In Royalty shall be due and owing to Lessor within ninety (90) days following any shut-in period of greater than one-hundred and twenty (120) days.

## Pooled Production Unit Limit

In the event Lessee desires to pool or unitize the leased premises with other lands and there is no spacing order previously established by a governmental or regulatory body, Lessee shall not have the right to form a production unit larger than 1,280 acres for any horizontal well, and Lessee shall not have the right to form a production unit larger than 60 acres for any vertical well. Lessee shall provide any unitized Lessor with a written unitization plan within thirty (30) days of the recording of the unit designation.

## Pugh Clause

If the Leasehold covered by this Oil and Gas Lease covers more than sixty (60) net acres and more than sixty percent (60%) of the Leasehold covered by this Oil and Gas Lease is not included in the production unit established by Lessee, this Lease shall automatically terminate two (2) years ("Extended Term") after the expiration of the primary term or any extension provided herein, insofar and only insofar as to all Leasehold outside a production unit established by Lessee for a well, provided if the Lessee, its successors or assigns shall be engaged in operations for the drilling, completing or testing of a new well or wells or the drilling, completing, testing, or deepening of an existing well or wells on the leased premises or on lands with which said Leasehold or a portion hereof have been included in a production unit, then this Oil and Gas Lease shall continue in full force and effect until such drilling, completing, testing or deepening operations have been completed.

## ROYALTY

### Royalty Payments Clause

Lessee shall pay to Lessor free of cost, a royalty equal to Seventeen and Five-Tenths percent (17.50%) of the gross proceeds received by Lessee for the sale of all oil, gas or related hydrocarbons produced and sold from the Leased Premises. It is understood and agreed that to the extent Lessee sells oil, gas or related hydrocarbons to an affiliate, the price upon which royalty shall be based shall be the greater of: a) the price paid by the affiliate; or b) the price that would have been received from a sale to an unaffiliated third party unde a sales arrangement for like quantity, quality, term and at the same point of sale to the affiliate.

## MISCELLANEOUS

### Arbitration Clause

Any questions concerning this Lease or performance there under shall be ascertained and determined by three disinterested arbitrators, one thereof to be appointed by Lessor, one by the Lessee and third by the

two so appointed as aforesaid and the award of such collective group shall be final and conclusive. Arbitration proceedings hereunder shall be conducted at the county seat or the county where the Lease is filed, or in the county where the action occurred which caused the arbitration, or such other place as the parties to such arbitration shall all mutually agree upon. Each party will pay its own arbitrator and share costs of the third arbitrator equally.

## Memorandum of Lease Clause
Lessor and Lessee hereby agree this Lease will be recorded of record by Memorandum and said Memorandum shall reference this Exhibit "A" and the terms hereof.

## Removal of Equipment
Any equipment needed for the operation of producing wells shall be removed within two (2) years after a well permanently ceases to produce. If said equipment is not removed within two (2) years after a well permanently ceases to produce then upon written notice from Lessor said equipment shall become the property of Lessor, provided that Lessor is the current surface owner at that time.

## Compliance Clause
Lessee's operations on said land shall be in compliance with all applicable federal and state laws and regulations.

## No Storage Rights Clause
Notwithstanding anything herein contained to the contrary, Lessee agrees the herein described leased premises shall not be used for the purpose of gas storage as defined by the Federal Energy Regulatory Commission. Any reference to gas storage contained in this lease is hereby deleted. If Lessor wishes to enter into an agreement regarding gas storage using the leased premises with a third party, Lessor shall first give Lessee written notice of the identity of the third party, the price or the consideration for which the third party is prepared to offer, the effective date and closing date of the transaction and any other information respecting the transaction which Lessee believes would be material to the exercise of the offering. Lessor does hereby grant Lessee the first option and right to purchase the gas storage rights by matching and tendering to the Lessor any third party's offering within 30 days of receipt of notice from Lessor.

## No Disposal or Injection Wells
Lessee agrees that no disposal or injection wells shall be placed upon the leased premises, absent express written approval from Lessor.

## Oil & Gas Only
This lease shall be deemed to cover only oil and gas and associated hydrocarbons/constituents.

## Existing Wells
Lessee agrees that any existing well on the Leased Premises shall be excluded from this Lease.

## Hold Harmless Clause
Lessee agrees it will protect and save and keep Lessor harmless and indemnified against and from any penalty or damage or charges imposed for any violation of any laws or ordinances, including but not limited to environmental liability, whether occasioned by the neglect of Lessee or those holding under Lessee, and Lessee will at all times protect, indemnify and save and keep harmless the Lessor against and from any and all loss, damage or expense, including any injury to any person or property whomsoever or whatsoever arising out of or caused by any negligence of the Lessee or those holding under Lessee. Lessor shall be named as an additional insured on Lessee's liability insurance policy. Prior to the commencement of drilling operations, Lessee shall provide to Lessor, a certificate of evidence for liability, workman's compensation and disability insurance. The insurance required herein may be met through a combination of primary, excess, and self insurance.

## Venue and Choice of Law
The venue for all actions and proceedings arising from this Lease shall be in the county in which the real property is located. The law of the state in which the real property is located shall apply.

## Ad Valorem Taxes Clause
Lessee and Lessor agree to pay their proportionate share of any increase in ad valorem taxes attributable to, or resulting from, the assessment of oil and gas due to production from the leased premises.

**Special Warranty Title**

It is understood that Lessor warrants title to said property only with respect that the title is good to the best of Lessor's knowledge and Lessee agrees that no claims will be made against Lessor pertaining to warranty of title.

**Audit Clause**

Lessee further grants to Lessor the right annually to examine, audit, or inspect books, records, and accounts of Lessee pertinent to the purpose of verifying the accuracy of the reports and statements furnished to Lessor, and for checking the amount of payments lawfully due the Lessor under the terms of this agreement. In exercising this right, Lessor shall give reasonable notice to Lessee of its intended audit and such audit shall be conducted during normal business hours at the office of Lessee. Such examination and audit shall be at the sole cost and expense of Lessor, unless the audit reveals deficiencies or underpayments, at which time Lessee shall pay to Lessor, within thirty (30) days, for the cost of the audit and immediately reimburse any deficiencies plus interest at the rate of 1.5% per month.

**Clean and Green Clause**

Lessee agrees that if and when any penalty, rollback or recapture of tax abatements created or imposed under any governmental program such as, but not limited to CREP, CRP and Clean and Green that is levied on Lessor solely as a result of Lessee's operations on leased premises, Lessee will reimburse Lessor upon written request and copy of the penalty notice, but only insofar as such assessments are imposed on that portion of the surface of the leased premises actually disturbed by such oil and gas operations and not reclaimed.

**Release of Lease**

Upon written request by Lessor and after termination, expiration, or surrender of this lease in whole or in part, Lessee shall provide Lessor with a copy of an appropriate release of lease and cause the same to be filed of record.


_____

Matthew M. Maurer


_____

Nancy L. Maurer

**EXHIBIT "B"**

This Exhibit "B" is attached to and made a part of that Certain Oil and Gas Lease dated June 29th, 2011, by and between <u>Matthew M. Maurer and Nancy L. Maurer, Husband and Wife</u>, as Lessor, and Chesapeake Exploration, L.L.C., as Lessee.

Parcel #24-02501-000, Gross Acres: 1.718